**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 09-CR-135-TCK |
| ) | |
| MARQUISE LEDON FONVILLE, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Before the Court is Defendant's Motion to Suppress (Doc. 12).

**I.  Factual Background**

The following facts were presented at the December 1, 2009 hearing before the Court ("December 1 hearing"). On August 19, 2009, at approximately 8:50 pm, Tulsa Police Officers Stephanie Blann ("Officer Blann") and Mark Wollmershauser, Jr. ("Officer Wollmershauser") were on foot patrol in the Town Square Apartment complex located at 1600 E. Young St. in Tulsa, Oklahoma. Both officers were dressed in "raid uniforms" – namely, jerseys with the word "Police" on the front and back. The officers also wore visible gun belts, which contained their guns, handcuffs, and badges. Officers Blann and Wollmershauser indicated that, in the months preceding August 19, the Town Square Apartment complex had become a "hot spot" for criminal activity. Specifically, as testified by the officers, the complex had become a site for gang fights, gun shootings, and robberies. Officer Wollmershauser had personally arrested known gang associates inside the apartment complex a few weeks prior and had also received an alert earlier in the day on August 19, indicating that there was a large gang fight occurring therein.

While on foot patrol, the officers saw two men, later identified as Defendant and Maurice Pyles ("Pyles"), walking through the apartment complex. The officers testified that, upon spotting

the two men, they immediately noticed that Defendant was walking in a "stiff" and unusual manner. Specifically, Defendant kept his right arm tight against the right side of his body, leading the officers to believe that he was trying to hide something against his body. The officers then decided to split up and approach the two men. Officer Blann approached Defendant and Pyles from the front, stating "Hey guys, what's up" in a conversational tone as she walked towards them. Officer Blann estimated that she was approximately fifteen to thirty feet away from them when she made this comment. According to Officer Blann, Defendant appeared "nervous" when he saw her and responded to her inquiry by "mumbling" something about going to an apartment. She testified that Defendant was "focused on her presence," "had a startled look on his face," and that his body "tensed up" when he was talking to her. Officer Blann also testified that Defendant began to "blade" his body away from her – that is, move the right side of his body away from her so that his left side was closer to her. As he was doing this, he continued to keep his right arm tight against his right side. At some point during her conversation with the two men, Pyles gave Officer Blann his identification card.

Shortly after Officer Blann initiated conversation with Defendant and Pyles, Officer Wollmershauser approached the two men from behind, standing approximately ten feet away from them. According to Officer Wollmershauser, he decided to approach the men from the rear because he had recently been involved in numerous "foot pursuits" and wanted to avoid such an occurrence if the situation escalated. Further, Officer Wollmershauser strategically stood in an "L" shape with Officer Blann so that the two officers were not directly across from each other in the event gunfire ensued. As Defendant "bladed" his body away from Officer Blann, he spotted Officer

Wollmershauser and, according to Officer Wollmershauser, appeared "startled" at Officer Wollmershauser's presence.

Officer Wollmershauser immediately thought Defendant looked familiar, and therefore asked for his name. According to Officer Wollmershauser, this inquiry was made in an conversational tone. After Defendant responded, Officer Wollmershauser realized why Defendant was familiar to him. Specifically, one to two weeks prior to August 19, another officer informed Officer Wollmershauser that Defendant was a suspect in an armed robbery occurring inside the Town Square Apartment complex. Officer Wollmershauser had also seen a photograph of Defendant in conjunction with alerts regarding other criminal activity. Officer Wollmershauser further testified that he was aware that Defendant was involved in the shooting of a Tulsa Police Department officer in 2006 and was a constant target of gang task force investigations.

Based on this prior knowledge and Defendant's unusual body language on the night of August 19, Officer Wollmershauser decided to initiate a "pat-down" of Defendant's person.[1] Officer Wollmershauser directed Defendant to turn around, to which Defendant complied. Officer Wollmershauser then grabbed Defendant's arms and reached for the right side of his waist band, feeling a metal grip of what Officer Wollmershauser believed to be a gun. Officer Wollmershauser testified that he then tightened his grip on Defendant and asked him if he had a gun, to which Defendant affirmatively replied. A .25 caliber Raven Arms semi-automatic pistol and ammunition were thereafter recovered from Defendant. Approximately five to seven minutes elapsed from the

---

[1] Hereinafter, the events preceding the pat-down of Defendant's person shall be referred to as the "initial encounter" between Defendant and the officers.

3

time she approached Defendant and Pyles to the time Officer Wollmershauser initiated the pat-down of Defendant.

As a result of these events, Defendant was charged in an two-count Indictment with: (1) possessing a firearm and ammunition after conviction of a felony in violation of 18 U.S.C. ¶¶ 922(g)(1) and 924(a)(2); and (2) possessing a firearm and ammunition after conviction of misdemeanor crime of domestic violence in violation of 18 U.S.C. ¶¶ 922(g)(9) and 924(a)(2). Defendant now seeks to suppress the firearm and ammunition found on his person on August 19, as well as the statements he made to Officer Wollmershauser on that date.

**II.     Discussion**

Defendant argues that his initial encounter with the officers constitutes a "seizure" in violation of his Fourth Amendment rights because a reasonable person in his position would not have felt free to leave and the officers lacked a reasonable, articulable suspicion that he was engaged in or was about to be engaged in criminal activity. Accordingly, Defendant maintains that all evidence obtained from the encounter should be suppressed. The Government, however, contends that until the pat-down was initiated, the encounter between Defendant and the officers was consensual and therefore did not implicate the Fourth Amendment.

      **A.     Whether the Initial Encounter Constitutes a "Seizure" Under the Fourth Amendment**

The Supreme Court has defined three types of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures and must be supported by reasonable articulable suspicion of criminal activity; and (3) arrests, which are the most intrusive Fourth Amendment seizures and must be supported by probable cause. *United States v. White*, 584 F.3d 935, 945-46 (10th Cir. 2009). These

categories are not static and may escalate from one to another. *Id.* "A reviewing court must analyze each stage of the police-citizen encounter, ensuring that the requisite level of suspicion or cause is present at each stage." *Id.* (internal citations omitted).

"A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Reeves*, 524 F.3d 1161, 1167 (10th Cir. 2008). "If the individual is free to leave at any time during the encounter, he or she is not seized under the Fourth Amendment." *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996). "Circumstances that indicate a seizure include, the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* (internal citations omitted). The Tenth Circuit has also considered whether "the encounter occurred in a confined or nonpublic space, the officers confronting the subject were armed or uniformed, more than one officer confronted the subject, the officers exhibited an intimidating or coercive demeanor, and the officers asked the subject potentially incriminating questions." *United States v. Glass*, 128 F.3d 1398, 1406 (10th Cir. 1997). No one factor is dispositive. *Id.*

Based on the testimony presented to the Court during the December 1 hearing, the Court finds that the initial encounter between Defendant and the officers was consensual and did not implicate the Fourth Amendment. Stated simply, a reasonable person in Defendant's position would have felt free to leave. Although Defendant makes much of the fact that Officer Blann approached him from the front while Officer Officer Wollmershauser approached from the rear, the testimony indicates that at no point in time was Defendant "boxed in" by the officers. Rather, the testimony

5

presented to the Court indicates that there was approximately ten feet between Defendant and the officers, and due to Officer Wollmershauser's "L" shaped positioning, Defendant was not effectively "surrounded" by the officers. Rather, he would have been able to walk past either officer based on their positioning. This fact is further evidenced by the testimony indicating that Defendant was "continuously moving" during the initial encounter with the officers.

Further, the record reflects that the encounter occurred in an open, unconfined, public location. Neither officer pulled a gun on Defendant, issued orders to Defendant, yelled at Defendant, told him he was not free to leave, or took any action to assert his/her authority as a police officer. Nor did either officer make any attempt to block Defendant's movement. The officers spoke to Defendant in a conversational manner, neither officer touched Defendant, and Defendant was not asked potentially incriminating questions. Based on the totality of these circumstances, the Court finds Defendant was free to leave at any time during the encounter and was therefore not seized under the Fourth Amendment. *See Hernandez*, 93 F.3d at 1498.

### B.    Whether Subsequent Pat-down of Defendant's Person was Lawful Under Fourth Amendment

"Under [*Terry v. Ohio*, 392 U.S. 1 (1968)], a law enforcement officer may stop a person without probable cause for arrest if the officer has a reasonable and articulable suspicion that the person might be involved in criminal activity." *United States v. Harris*, 313 F.3d 1228, 1234 (10th Cir. 2002). Further, "[i]f the officer has such reasonable and articulable suspicion, she may also conduct a protective frisk of the suspect's outer clothing if she reasonably believes that the suspect might be armed and presently dangerous." *Id.* However, "[t]he sole justification of the search . . . is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for

the assault of the police officer." *Id.* (internal quotations omitted). "When evaluating the validity of a *Terry* stop, the totality of the circumstances - the whole picture - must be taken into account." *Id.* (internal quotations omitted). If the pat-down search was not justified by officer safety concerns, all resulting evidence (the gun, ammunition, and incriminating statements) must be suppressed as fruit of an unlawful stop and/or frisk. *See Wong Sun v. United States*, 371 U.S. 471, 486-487 (1963).

In this case, the Court finds that the pat-down of Defendant's person was justified for officer safety based on the following facts: (1) Defendant's body language was associated with a person who is trying to hide a weapon on his person; (2) Defendant was a suspect in an armed robbery that occurred at the Town Square Apartments two weeks prior; (3) Defendant was involved in the shooting of a Tulsa Police Department officer in 2006; (4) Officer Wollmershauser had seen Defendant's photograph and name in conjunction with alerts about criminal activity; and (5) Defendant was constant target of gang task force investigations. Indeed, courts have upheld pat-down searches of individuals under similar circumstances – namely, where a defendant was a suspect in other criminal activity or was associated with gang activity. *See, e.g., United States v. Robinson*, 537 F.3d 798, 801 (7th Cir. 2008) (finding pat-down was reasonable in part because defendant was a gang member and a suspect in a shooting); *United States v. Garcia*, 459 F.3d 1059, 1066 (10th Cir. 2006) (considering fact that defendant was found in apartment of known gang member in upholding reasonableness of frisk) (citing *United States v. Osborne*, 326 F.3d 274, 278 (1st Cir. 2003) (upholding reasonableness of frisk in part because defendant was a "member of a violent street gang")); *United States v. Lang*, 81 F.3d 955, 966 (10th Cir. 1996) (finding it was reasonable for officers to conduct a pat-down search because they believed defendant was a suspect in two armed robberies and robbery-murder). Therefore, based on these facts, Officer

Wollmershauser had a reasonable belief that Defendant might be armed and dangerous, justifying a protective frisk of Defendant's person.  *See Harris*, 313 F.3d at 1234.

Finally, there was no evidence presented to the Court indicating that the pat-down of Defendant's person was excessive in scope.  Officer Wollmershauser felt the waistband of Defendant's pants before inquiring if Defendant had a gun; such action was confined in scope and related to the discovery of hidden weapons that could have been used against the officers.  *See id.*

### III. Conclusion

For the reasons outlined herein, Defendant's Motion to Suppress (Doc. 12) is DENIED.

**IT IS SO ORDERED this 8th day of December, 2009.**

_____
**TERENCE KERN**
**United States District Judge**